IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 25, 2001

## STATE OF TENNESSEE v. PATRICK D. PARIS

**Appeal from the Criminal Court for Hamilton County**
**Nos. 216583-216585     Stephen M. Bevil, Judge**

---

**No. E2000-02672-CCA-R3-CD**
**October 29, 2001**

---

The defendant, Patrick D. Paris, appeals from his convictions for attempted first degree murder and especially aggravated robbery, contending that the evidence is insufficient to support his convictions and that the trial court erred by allowing hearsay testimony into evidence as an excited utterance. We affirm the judgments of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JOE G. RILEY and ALAN E. GLENN, JJ., joined.

Jeffrey S. Schaarschmidt (on appeal) and John Brooks (at trial), Chattanooga, Tennessee, for the appellant, Patrick D. Paris.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; William H. Cox, III, District Attorney General; and Barry Allen Steelman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant was convicted by a jury for attempted first degree murder, a Class A felony, and especially aggravated robbery, a Class A felony. The trial court sentenced him as a Range I, standard offender to twenty-three years in the Department of Correction for the attempted first degree murder conviction. He received a concurrent sentence of twenty years with no parole for the especially aggravated robbery conviction.

This case relates to the shooting of Jason Davis on April 7, 1997. The victim testified that on April 5, 1997, he was living in Clarksville and that he and Derrick Jenkins drove the victim's Chevrolet Blazer to Chattanooga. He said that he went there to visit his family and that he and Mr. Jenkins spent the night in a hotel. He said that the next morning, he drove Mr. Jenkins around Chattanooga to show him the city. He said that they drove by the defendant's house and that the

defendant flagged him down. He said that he and the defendant, also known as "Patti Boo," smoked marijuana and talked. He said that he and the defendant were not friends but that they had hung out together and smoked marijuana before.

The victim testified that the defendant told him that Edward "Ace" Williams wanted to talk to the victim. The victim said that he, the defendant, and Mr. Jenkins drove the Blazer to Mr. Williams' house. He said that they talked with Mr. Williams until Mr. Williams' girlfriend came home. He said that he, the defendant, Mr. Williams, and Mr. Jenkins rode around in the Blazer for a while and smoked marijuana. He said that they returned to Mr. Williams' house that afternoon, parked the Blazer, and left again in Mr. Williams' rental car. He said that he was carrying a 9 millimeter gun and that the defendant was carrying a .38 caliber gun. He said that they rode around until about 12:30 a.m. on April 7, when they stopped at the Krystal Restaurant on Highway 58 and ate. He said that they left the restaurant and decided to go to a house owned by someone named "Land" and talk to him about buying drugs. He said that they decided to take a shortcut to Mr. Land's house. He said that they parked by the Side Pockets pool hall on Highway 58 and that he, the defendant, and Mr. Williams started walking on a trail to Mr. Land's house, while Mr. Jenkins slept in the car. He said that as they started walking, he decided to return to the Krystal to use the bathroom. He said that before he left, he gave his gun to Mr. Williams or the defendant. He said that he drove Mr. Williams' car to the Krystal, used the bathroom, and drove back to Side Pockets. He said that when he got back to the trail, Mr. Williams and the defendant were hiding from him. He said that he saw Mr. Williams hiding, told Mr. Williams and the defendant to come out, and that the two men came out and met him. He said that the defendant gave him his gun back and that he thought "something was kind of funny," so he checked to make sure the gun was still loaded. He said that the three of them started up the trail to Mr. Land's house. He said that Mr. Williams was in front of him and that the defendant was behind him. He said that as they were walking, the defendant shot him, and everything went black.

The victim testified that he awoke about two hours later with a loud ringing in his ears. He said that, at first, he thought the defendant had hit him in the head with a brick. He said that he tried to get up but kept falling over. He said that he knew something was wrong and that he touched the back of his head and felt blood and a hole. He said that he knew he had been shot. He said that his gun, beeper, jewelry, car keys, and $600 were gone. He said that he crawled across Highway 58 to the Golden Gallon convenience store, pulled up onto the door, and fell inside. He said that he thought he remembered saying, "Patti Boo shot me." The victim stated that he was in the hospital for eight days.

The victim testified that he had pulled out his money in front of the defendant while they were at the Krystal. He said that after the shooting, he met the defendant in the hallway of the Hamilton County Jail, and the defendant told him, "I should have killed you, I wish I would have killed you." The prosecution showed the victim a photograph that the police took on April 23, 1997, showing the defendant standing in front of a Chevrolet Blazer. The victim identified his Blazer in the photograph and said that the defendant was wearing the victim's shirt and tennis shoes.

At the time of trial, the victim was serving an eleven-year sentence for two robbery convictions. On cross-examination, he acknowledged that he did not have a job at the time he was shot. He said that he got the $600 from his girlfriend, his brother, and selling marijuana. He said that in 1996, he pled guilty to robbery and aggravated burglary. He said that in 1998, he pled guilty to an aggravated robbery that was committed in Hamilton County on April 5, 1997, two days before he was shot. He denied that he went to Chattanooga to commit a robbery, and he denied planning to rob Mr. Land's house. He acknowledged being on probation when he was shot, having an extensive juvenile record, and previously lying under oath.

Jennifer Ellis, manager of the Golden Gallon on Highway 58, testified as follows: At 6:30 a.m. on April 7, 1997, the victim walked into the Golden Gallon on Highway 58. He was covered with blood and said he had been shot. Ms. Ellis laid the victim down on his stomach because he had a hole in the back of his head. She tried to keep the victim conscious by asking him questions. Although Ms. Ellis could not understand most of what the victim said, she heard him say repeatedly, "Patti Boo done shot me."

Mike Wallaford, who lives across the street from the Golden Gallon, testified as follows: At about 4:00 a.m. on April 7, 1997, he heard one gunshot. He thought that his neighbors were shooting at each other and called 9-1-1.

Bill Phillips, an investigator with the Chattanooga Police Department, testified that he went to the hospital on April 7, 1997, and asked the victim questions. He said that the victim told him that the defendant and Mr. Williams shot him. He said that he formally interviewed the victim on April 22, 1997, and that the victim told him the defendant shot him. He said that he asked the victim if the four men had gone to Mr. Land's house to rob someone and that the victim said he could not remember. He said that the victim told him that before he went back to the Krystal to use the bathroom, he gave his gun to Mr. Williams, not the defendant. He said that the victim told him they parked at the Side Pockets pool hall so that they would not be seen.

Officer Phillips said that he met with the defendant on April 10, 1997, and that, at first, the defendant said he did not know anything about the shooting. He said that over the course of his investigation, the defendant gave four different versions of what happened. He said that the defendant told him that Mr. Williams probably shot the victim because there was a contract out on the victim's life. He said that on April 23, 1997, he found the victim's Blazer on the street where the defendant lived. He said that the defendant told him that he bought the Blazer from the victim. He said that he never found the gun that was used to shoot the victim.

Kaya Reeves, the victim's girlfriend, testified as follows: She and the victim lived together in Clarksville. On April 7, 1997, the defendant and Derrick Jenkins came to her house. The defendant was driving the victim's Blazer and told her that he was the victim's cousin. He told her that the victim had been in a shootout with police and that the victim was in jail with a $10,000 bond. The defendant told her that the victim asked him to go to Clarksville and get his stuff. Ms. Reeves started to call the victim's parents in Chattanooga to tell them that the victim was in jail.

However, the defendant told her that the victim did not want his mother to find out. Ms. Reeves packed the victim's clothes and gave them to the defendant. The defendant took most of the victim's clothes, a gun, and a Playstation. After the defendant left, Ms. Reeves called the Chattanooga and Clarksville jails, but she could not find the victim. Ms. Reeves called the victim's mother and learned that he had been shot. On cross-examination, Ms. Reeves said that the victim did not work or sell drugs. She said that she gave him $600 to buy clothes and marijuana in Chattanooga. She said that the victim kept a gun under the couch in her house and that he carried another gun with him.

Ronnie Bennett testified that he is serving a twenty-one-year federal sentence for cocaine and firearm convictions. He said that he and the defendant met in July 1996 and that they were good friends. He said that in November 1996, he met the victim and that the two of them started spending a lot of time together. He said that the defendant was jealous of his friendship with the victim. He said that he was in jail when he heard about the victim getting shot. He said that he called the defendant and that the defendant told him, "I got your boy." He said that the defendant told him that he shot the victim in the back of the head as they were walking to Mr. Land's house. He said that the defendant told him that he bought the victim's truck from the victim. He said that the defendant thought the victim was messing with the defendant's girlfriend.

Edward "Ace" Williams testified that he was charged with attempted first degree murder, especially aggravated robbery, and accessory after the fact in connection with the victim's shooting. He said that in return for testifying against the defendant, he was allowed to plead guilty to accessory after the fact and receive a two- to four-year sentence for his participation in the crime. He said that the victim, the defendant, and Derrick Jenkins came to his house on April 6, 1997. He said that he, the defendant, the victim, and Mr. Jenkins left in the victim's Blazer. He said that they drove into a bank parking lot, where other cars were parked. He said that he got out and talked to a girl while the defendant, the victim, and Mr. Jenkins sat in the Blazer and smoked marijuana. He said that the four of them drove back to his house about 4:00 p.m. He said that when he got home, the defendant, the victim, and Mr. Jenkins left and that he called his brother. He said that he wanted his brother to steal the radio out of the victim's Blazer. He said that the victim, the defendant, and Mr. Jenkins returned to his house about 11:00 p.m. and that he got the victim to leave the Blazer at his house, while the four of them rode around in his rental car. He said that he planned to keep the defendant away from the Blazer long enough for his brother to steal the radio out of it.

Mr. Williams testified that they rode around for about two hours and that they stopped to get something to eat. He said that after they ate, they parked beside a pool hall on Highway 58. He said that the four of them walked a trail to Mr. Land's house in order for the victim to buy drugs. He said that the victim had to use the bathroom and borrowed Mr. Williams' car to return to the Krystal. He said that before the victim left, the victim gave his gun to the defendant. He said that the victim and Mr. Jenkins left and that he went into the woods to use the bathroom. He said that the defendant said the victim had been messing with the defendant's girlfriend and added, "Man, if the n***** lie about it I'm going to bust him." Mr. Williams stated that he was still in the woods when the victim returned and that the victim said, "Where you all at, man?" He said that he came out of the woods and that he and the defendant met the victim. He said that Mr. Jenkins stayed in the car.

Mr. Williams testified that the defendant returned the victim's gun. He said that he walked back to the car while the defendant and the victim went to Mr. Land's house. He said that after they had been gone about twenty minutes, he went to look for them. He said that he saw them coming toward him and that he walked into the woods. He said that when he got to the woods, he heard a shot. He said that he went back to the car and that the defendant ran to the car and said someone was shooting at them. He said that he asked the defendant where the victim was and that the defendant said the victim ran a different way. He said that he, the defendant, and Mr. Jenkins rode around and looked for the victim. He said that they never found the victim and went back to Mr. Williams' house. He said that when they got to his house, he noticed that his brother had not broken into the Blazer. He said that the defendant got into the victim's Blazer and left. He said that the defendant told him that the victim gave the defendant the keys to the Blazer.

Mr. Williams testified that about an hour later, the defendant returned and told him the victim was in jail and had a $10,000 bond. He said that the defendant left again and that later that morning, Mr. Williams took Mr. Jenkins to the defendant's house. He said that when they got to the defendant's house, the defendant came out and told him, "I shot that n*****, man." He said he left Mr. Jenkins at the defendant's house, went to work, and went back to the defendant's house to pick up Mr. Jenkins, but the defendant and Mr. Jenkins were gone. He said that three days later, his parole officer told him there was a warrant for his and the defendant's arrests. He said that he went to the defendant's house and that the defendant was washing the victim's Blazer. He said that he told the defendant that a warrant had been issued for their arrests. He said that they turned themselves in and got out on bond. Mr. Williams said that he took the defendant to see Mr. Williams' attorney and that the defendant gave the attorney a tape recorded statement. He said that the defendant lied throughout the statement.

On cross-examination, Mr. Williams testified that while he was riding around with the defendant, the victim, and Mr. Jenkins on April 6, the victim pulled a gun on some people in a white car. He said that the defendant was planning to rob Mr. Land. Mr. Williams testified that he has a very bad reputation and that he has been shot nine times. He said that he is not "streetwise."

Russell Bean, Edward Williams' attorney, testified as follows: Mr. Williams brought the defendant to his office on April 11, 1997. The defendant gave a tape recorded statement and said that he and Mr. Williams were not involved in the victim's shooting.

The defendant testified that he met the victim in November 1996. He said that on April 6, 1997, the victim and Mr. Jenkins came to his house and that he and the victim smoked marijuana. He said that he, the victim, and Mr. Jenkins went to Mr. Williams' house about 2:00 p.m. He said that about thirty minutes later, all four of them left in the victim's Blazer to go to the park. He said that they never made it to the park and that the victim tried to chase down some men in a white, Chevrolet Caprice. He said that they parked at a car wash and that Mr. Williams got out to talk to a girl while he, the victim, and Mr. Jenkins smoked marijuana in the Blazer. He said that they left the car wash and left Mr. Williams at his house about 3:00 p.m. He said that he, the victim, and Mr.

Jenkins returned to Mr. Williams' house about 10:00 p.m. and that the four of them left in Mr. Williams' car. He said that the victim and Mr. Williams were talking about committing a robbery.

The defendant said that he had a .38 caliber pistol with him that he had gotten from Mr. Williams and that the victim also was carrying a gun. He said that they went to Mr. Land's house to rob it and that they waited in the bushes behind Mr. Land's house. He said that about 1:00 a.m., they got hungry and went to the Krystal. He said that they stayed at the restaurant about forty-five minutes. He said they left the restaurant and parked in the Side Pockets parking lot. He said that they hid in the bushes "to scope the place out for a minute." He said that he and the victim walked the trail to Mr. Land's house, while Mr. Williams remained in the bushes. He said that Mr. Jenkins returned to the car. He said that the victim left to return to the Krystal but that the victim did not give him a gun.

The defendant testified that when the victim returned from the Krystal, he and the victim decided not to rob Mr. Land's house. He said that he and the victim started walking side by side back to Mr. Williams' car. He said that somebody came up behind them and fired a shot and that he ran to the car. He said that he noticed that Mr. Williams was behind him. He said that the two of them jumped into the car and that he thought Mr. Williams shot the victim. He said that he, Mr. Williams, and Mr. Jenkins rode around and looked for the victim and that they went back to Mr. Williams' house. He said that Mr. Williams gave him the keys to the victim's Blazer and that he drove the Blazer home about 3:00 a.m. He said that Mr. Jenkins stayed with Mr. Williams.

The defendant testified that later that morning, Mr. Williams brought Mr. Jenkins over to his house. He said that Mr. Williams told him to kill Mr. Jenkins. The defendant said that he took Mr. Jenkins to Clarksville and that they went to Kaya Reeves' house. He said that he told Ms. Reeves the victim was in jail and that he took the victim's clothes. He said that he took Mr. Jenkins home and that he returned to Chattanooga.

The defendant acknowledged that he lied when he gave his taped statement to attorney Russell Bean. He said that Mr. Williams threatened to kill him if he said anything about Mr. Williams. He said that he lied to Officer Phillips on April 10, 1997, because he was afraid that Mr. Williams would hurt him. The defendant denied shooting the victim or taking anything from him. He said that he and the victim were in the Hamilton County Jail after the shooting and that the victim came to his cell and said, "I'm going to get you and I put that on everything I love."

On cross-examination, the defendant acknowledged that he was lying when he said he owned the Blazer. He said that in the photograph the police took on April 23, 1997, the only items belonging to the victim that he wore were the victim's tennis shoes. He said that Mr. Williams was jealous that the defendant was hanging around the victim.

# I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support his convictions for attempted first degree murder and especially aggravated robbery. The state argues that the evidence is sufficient. We agree with the state.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Criminal attempt requires that one act "with the kind of culpability otherwise required for the offense . . . [and] with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." Tenn. Code Ann. § 39-12-101(a)(2). First degree murder is the "premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1). Premeditation is defined as:

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d). The element of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. State v. Bland, 958 S.W.2d at 660. Our supreme court has delineated the following factors that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. Id.

Especially aggravated robbery is defined as robbery that is "(1) [a]ccomplished with a deadly weapon; and (2) [w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a). A deadly weapon is defined as "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury[.]" Tenn. Code Ann. § 39-11-106(a)(5)(B).

Viewed in the light most favorable to the state, the evidence reveals that the defendant committed especially aggravated robbery and attempted to commit first degree murder. The victim was shot as he walked with the defendant and Mr. Williams to Mr. Land's house. Mr. Williams was walking ahead of the victim, and the defendant was walking behind the victim, when the victim lost consciousness. When the victim awoke, he heard a loud ringing in his ears and could not walk without falling over. He touched the back of his head, felt blood and a hole, and realized that he had been shot. The victim's gun, beeper, jewelry, car keys, and money were missing. The defendant, who was carrying a gun when the victim was shot, told Mr. Williams and Ronnie Bennett that he shot the victim. Furthermore, the defendant lied to the victim's girlfriend in order to obtain the victim's clothing and told several witnesses that he bought the Blazer from the victim. The defendant wore the victim's clothes and drove the victim's Blazer in the days after the shooting. Although the defendant argues that some of the state's witnesses were not credible, the credibility of the witnesses and the weight to be given to their testimony are issues to be resolved by the trier of fact, not this court. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). The jury chose to believe the testimony of other witnesses over that of the defendant, and that is its prerogative. Id. We believe the evidence is sufficient to support the defendant's convictions.

## II. EXCITED UTTERANCE TESTIMONY

The defendant contends that the trial court erred by admitting hearsay testimony into evidence. He argues that the trial court improperly allowed Jennifer Ellis to testify that the victim stated, "Patti Boo done shot me." Although the trial court found that the statement was admissible under the excited utterance exception to the hearsay rule, the defendant argues that the excited utterance exception does not apply because the victim had time to reflect on his injury and had no memory of being shot in the back of the head. The state argues that the testimony was admissible. We agree with the state.

Three requirements must be met for a hearsay statement to be admissible as an excited utterance: (1) there must be a startling event or condition; (2) the statement must relate to the startling event or condition; and (3) the statement must be made while the declarant is under the stress or excitement from the event or condition. Tenn. R. Evid. 803(2); State v. Gordon, 952 S.W.2d 817, 820 (Tenn. 1997). The "ultimate test" for determining the admissibility of an excited utterance is "spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement and strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication." State v. Smith, 857 S.W.2d 1, 9 (Tenn. 1993). Other relevant considerations include: (1) the time interval between the startling event and the statement; (2) the nature and seriousness of the condition; (3) the appearance, behavior, outlook, and circumstances of the declarant, including characteristics such as age, physical condition, and mental condition; and (4) the contents of the statement, which may indicate the presence or absence of stress. Gordon, 952 S.W.2d at 820. The rationale behind the excited utterance exception is that the hearsay statement is reliable because it is made when time for reflection and possible fabrication are lacking and memory of the event is still fresh in the

declarant's mind. Id. at 819-20 (citing Neil P. Cohen et al., Tennessee Law of Evidence, § 803(2).1, at 532 (3d ed. 1995)).

We believe that being shot in the back of the head and the victim's discovery of that fact are startling events and that the statement "Patti Boo done shot me" relates to those events. It is also reasonable to conclude from the evidence that the victim was still under the stress and excitement of being shot when he made the statement. The evidence shows that the defendant shot the victim at 4:00 a.m. and that the victim awoke about two hours later. The victim touched the back of his head, felt blood and a hole, and immediately began crawling for help. At 6:30 a.m., he fell into the Golden Gallon and made the statement at issue. We do not believe the time interval is so great that the victim could not have been under stress from the shooting. The defendant argues that the victim's statement was inadmissible because the victim made the statement after he had time to reflect and because the startling event was not fresh in his mind. However, the time interval is just one factor to consider in an excited utterance analysis. In addition, the victim testified at trial that he remembered walking the trail to Mr. Land's house and that Mr. Williams was in front of him and the defendant was behind him. Thus, the victim remembered the events and moments leading up to the shooting, and he reasonably believed that the defendant shot him. We conclude that the victim's statement was properly admitted by the trial court.

Based upon the foregoing and the record as a whole, we affirm the judgments of conviction.

_____
JOSEPH M. TIPTON, JUDGE